NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

NATIONAL INDEMNITY COMPANY,

Plaintiff,

v.

COMPANHIA SIDERURGICA NACIONAL
S.A. & CATALYST RE CONSULTING,
L.L.C.

Defendants.

Civil Action No.: 15-752 (JLL)

OPINION

**LINARES**, District Judge.

This matter comes before the Court by way of a motion to dismiss for lack of personal jurisdiction filed by Defendant Companhia Siderurgica Nacional, S.A. ("CSN").[1] (ECF No. 79, "CSN's Mov. Br."). Plaintiff National Indemnity Company ("NICO") and Defendant Catalyst Re Consulting, L.L.C. ("Catalyst Re") have opposed CSN's motion.[2] (ECF Nos. 80, "Pl.'s Opp. Br."; 81, "Catalyst Re's Opp. Br."). CSN has filed a reply to the opposition. (ECF No. 82, "CSN's Reply Br."). The Court decided this matter without oral argument pursuant to Federal Rule of Civil Procedure 78, and for the reasons stated herein, the Court grants in part and denies in part CSN's motion to dismiss for lack of personal jurisdiction.

---

[1] CSN also seeks dismissal on the grounds that it was not properly served. (CSN's Mov. Br. at 19-24). However, this Court indicated in its December 17, 2015 text order (ECF No. 78) that the Court will reserve ruling on Plaintiff's related motion (ECF No. 6) for alternative service until after its determination on the personal jurisdiction issue. Accordingly, CSN's arguments for dismissal based upon improper service will be dealt with after the Court issues the instant Opinion and accompanying Order.

[2] The parties dispute whether Catalyst Re has standing to oppose this motion. (See ECF Nos. 83-85). Having reviewed Catalyst Re's moving brief, and finding that it fails to raise any arguments not otherwise raised by Plaintiff, the Court will disregard Catalyst Re's opposition brief entirely. The Court also notes that Plaintiff attached Catalyst Re's opposition brief and all exhibits thereto in support of its opposition brief. Although the Court declines to consider Catalyst Re's brief itself, the Court will consider the exhibits attached thereto and cited by Plaintiff in its brief. That Plaintiff chose to attach these documents as an exhibit to Catalyst Re's brief, rather than as separate exhibits to its own brief, does not preclude the Court from considering these documents.

## I.    BACKGROUND [3]

### A.  The Parties

Plaintiff NICO is a Nebraska insurance company that provides reinsurance (also known as "retrocessional coverage")[4] to insurers in the United States and abroad.  (Compl. ¶ 4).  NICO's principle place of business is Omaha, Nebraska.  (Id.).  IRB Brasil Resseguros S.A. ("IRB") is a Brazilian insurance company (Compl. ¶ 16) who, although initially named as a defendant, has since been dismissed from the case without prejudice.  (ECF No. 74).  Defendant CSN is a Brazilian corporation and "one of the largest conglomerates in Brazil with interests in steel, iron ore, mining, and various other operations." (Compl. ¶ 13).  Defendant Catalyst Re is a reinsurance broker located and operating out of New Jersey that specializes in securing reinsurance coverage for South American businesses.  (Compl. ¶ 18).

### B.  Pertinent Facts

#### a.   The Alleged Reinsurance Contract

Plaintiff filed the instant action on February 2, 2015, seeking declaratory relief as well as actual damages against Defendants for alleged tortious conduct relating to a reinsurance contract allegedly entered into between Plaintiff and IRB.  Specifically, Plaintiff alleges claims of tortious

---

[3] The facts as stated herein are taken as alleged in Plaintiff's Complaint.  (ECF No. 1, "Compl.").  For purposes of this Motion to Dismiss, these allegations are accepted by the Court as true.  *See Phillips v. County of Allegheny,* 515 F.3d 224, 228 (3d Cir. 2008) ("The District Court, in deciding a motion [to dismiss under Rule] 12(b)(6), was required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff].").

[4] "Reinsurance is an arrangement whereby an insurer (the reinsured or the ceding company) cedes or transfers all or part of the risk on an underlying insurance policy or group of policies to a reinsurer, which agrees to indemnify the ceding company for the risk transferred in exchange for receiving a premium.  Reinsurers may, in turn, cede all or part of the risk they have agreed to reinsure to other reinsurers. This type of arrangement is known as retrocessional coverage and the reinsurer ceding the risk and the reinsurer accepting the risk are referred to as, respectively, the retrocedent and the retrocessionaire." (Compl. ¶ 11).

interference with a contractual relationship (Count II), tortious interference with economic advantage (Count III), unjust enrichment (Count IV), injurious falsehood (Count V), prima facia tort (Count VI), and civil conspiracy (Count VII).

According to Plaintiff, in 2007, CSN purchased a direct insurance policy (the "2007 CSN-Sul America Policy") from Sul America Cia Nacional de Seguros ("Sul America") for the period of January 21, 2007 to November 21, 2007 (the "Original Period"). (Compl. ¶¶ 14-15). Sul America is a Brazilian insurance company, and is not a party to this action. (Id. ¶ 15). Sul America and CSN later extended the 2007 CSN-Sul America Policy from November 21, 2007 to February 21, 2008 (the "Extension Period"). (Id.). CSN's direct policy provided for $750 million in coverage. (Id.).

To protect itself against risk of loss, Sul America reinsured about $748 million of the $750 million 2007 CSN-Sul America Policy through IRB. (Id. ¶ 16). IRB, in turn, sought retrocessional coverage of approximately $725 million of the $748 million in reinsurance of the 2007 CSN-Sul America Policy. (Id. ¶ 17). To that end, Plaintiff alleges that "[o]n or about November 5, 2007, Alexandre Leventhal of Cataylst Re [the New Jersey-based reinsurance broker] approached NICO describing himself as an agent for IRB, to request that NICO provide retrocessional coverage for IRB's reinsurance of the 2007 CSN Policy (for the Extension Period only)." (Id. ¶ 18). NICO alleges that NICO and IRB entered into an agreement whereby IRB paid NICO approximately $760,000 in premium in consideration of NICO providing retrocessional coverage in the amount of $60,850,000 (the "2007 Retrocessional Contract"). (Id. ¶ 19).

CSN thereafter secured direct insurance from a Brazilian insurance company by the name of Mapfre Seguros (the "2008 CSN-MS Policy") for the period of February 21, 2008 through February 21, 2009. (Id. ¶ 21). Plaintiff alleges that IRB reinsured the 2008 CSN-MS Policy and

that IRB again acted through its New Jersey-based reinsurance broker, Catalyst Re, to purchase reinsurance coverage from NICO as well as other non-Brazilian reinsurers. (Id. ¶ 22). Plaintiff alleges that NICO and IRB entered into an agreement whereby NICO agreed to provide $189,680,000 in retrocessional coverage (the "2008 Retrocessional Contract") in exchange for IRB's payment of an approximately $9 million premium. (Id. ¶ 23).

In early 2008, Mr. Leventhal of Catalyst Re notified NICO that IRB would not be able to pay the set premium within the timeframe provided for in the 2008 Retrocessional Contract. (Id. ¶ 25). After learning about the delay in payment, "CSN, out of concern that such delay might negatively impact its recovery of losses under the 2008 CSN Policy, instructed Mr. Leventhal to communicate to NICO, on its behalf and as its agent, that CSN would guarantee payment of the premium owed by IRB to NICO under the 2008 Retrocessional Contract." (Id. ¶ 26). The Complaint alleges that Mr. Leventhal, acting as CSN's agent, wrote to NICO informing it that CSN would pay the approximately $9 million premium and requesting an extension of time by which CSN could make the payment. (Id. ¶ 28). NICO agreed to the extension. (Id. ¶ 29). Then, "[i]n April 2008, CSN, to fulfill IRB's premium obligation to NICO, wired over $20 million into a 'premium account' located in Ridgewood, New Jersey which was owned and controlled by Catalyst Re to be used to pay the premium owed by IRB to NICO (as well as to other IRB retrocessionaires)." (Id. ¶ 31). On or about April 22, 2008, Catalyst Re wired approximately $9 million of the premium funds from CSN to NICO. (Id. ¶ 32).

Plaintiff alleges that "[f]ollowing NICO's issuance of the 2008 Retrocessional Contract, IRB affirmed and acknowledged the validity of that contract on a number of occasions. CSN's agent, Faber Global, also confirmed to NICO the existence of the 2008 Retrocessional Contract." (Id. ¶ 33). It is the existence and circumstances surrounding this 2008 Retrocessional Contract,

4

and CSN's payment of the approximately $9 million premium to NICO, via Catalyst Re, which is at the center of this dispute.

### b.  Alleged Repudiation of the 2008 Retrocessional Contract

In 2008, CSN filed a claim for property loss under the 2007 and 2008 CSN Policies, but later limited its claim to coverage of the Original Period of the 2007 CSN-Sul America Policy. (Id. ¶ 34).  CSN then filed a coverage action in Brazil against Sul America and IRB relating to coverage under the 2007 CSN-Sul America Policy (the "Coverage Action").  (Id. ¶ 34).  This claim was settled in November 2013, and IRB thereafter turned to NICO for coverage under the 2007 Retrocessional Contract.  (Id. ¶ 35).  IRB's coverage claim with NICO was ultimately resolved in arbitration.  (Id.).

On November 26, 2014, CSN e-mailed NICO requesting that NICO pay CSN the $9 million premium that Catalyst Re had wired to NICO to effectuate the 2008 Reinsurance Contract between NICO and IRB.  (Id. ¶ 36).  In that same e-mail, CSN explained that it had filed a lawsuit in Brazil (the "Court Action") against IRB (separate from the above-discussed Coverage Action) when IRB failed to acknowledge that it was the reinsurer of CSN's 2008 Policy.  (Id.).  The Court Action was settled by way of a Settlement Agreement executed on November 27, 2013.  (Id. ¶ 38). In the November 26, 2014 e-mail to NICO, CSN stated "that IRB, in the Settlement Agreement, had confirmed that it was, in fact, the reinsurer of the 2008 CSN Policy but denied that it had purchased any retrocessional coverage, including the 2008 Retrocessional Contract with NICO, for its reinsurance of the 2008 CSN Policy." (Id. ¶ 39).  CSN informed NICO that IRB agreed to help CSN retrieve the $9 million premium that CSN paid to NICO to secure the completion of the 2008 Retrocessional Contract.  (Id.).

5

### c.  NICO's Allegations and Relief Sought

Against this backdrop, Plaintiff alleges that "[t]he Settlement Agreement was an [sic] wrongful and collusive act by IRB and CSN to deprive NICO of premium that it had rightfully and duly earned more than five years earlier in 2008 as consideration for assuming substantial risk of loss under the 2008 Retrocessional Contract (i.e., up to $189,680,000 in losses) from February 21, 2008 to February 21, 2009, when the agreement was in full force and effect."  (Id. ¶ 43). Accordingly, Plaintiff requests a judgment from this Court:

> (1) Declaring that the 2008 Retrocessional Contract is a binding and enforceable agreement between IRB and NICO; (2) Declaring that CSN is not in privity with NICO under the 2008 Retrocessional Contract or any other agreement; (3) Declaring that CSN has no rights or interests in any of the premium paid to NICO under the 2008 Retrocessional Contract; [and] (4) Declaring that CSN has no rights or interests in any of the premium paid to NICO under the 2008 Retrocessional Contract.

(Id. at 17).

In addition to seeking declaratory relief, Plaintiff alleges the following claims against CSN, which are premised upon its allegedly wrongful execution of the Settlement Agreement: (1) tortious interference with a contractual relationship (Count II); (2) unjust enrichment (Count IV); (3) injurious falsehood (Count V), and; (4) civil conspiracy (Count VII).  In Count III, Plaintiff alleges tortious interference with economic advantage against Catalyst Re, specifically alleging that NICO entered into the 2008 Retrocessional Contract based in part upon Catalyst Re's representations, on behalf of CNS and IRB, that the these parties intended to effectuate that Contract.[5]


## II.    LEGAL STANDARD

---

[5] Count IV of the Complaint alleges prima facia tort as against IRB only.  (Compl. at 15).  As IRB has been dismissed from this case, this Count is now moot.

Once a defendant files a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), the "plaintiff must prove by affidavits or other competent evidence that jurisdiction is proper." *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (internal citations omitted).   Where, as here, the district court does not hold an evidentiary hearing, a plaintiff need only establish a "prima facie case of personal jurisdiction and the plaintiff is entitled to have its allegations taken as true and all factual disputes drawn in its favor." *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 97 (3d Cir. 2004).   Additionally, "[i]f the contents of the plaintiff's complaint conflict with the defendant's affidavits, the district court must construe all reasonable inferences that can be drawn from the papers in the plaintiff's favor." *Haffen v. Butler Specialties, Inc.*, No. 10-cv-2833, 2011 WL 831933 at *2 (D.N.J. Mar. 3, 2011) (quoting 4 Wright & Miller, Federal Practice and Procedure: Civil 3d 1067.6 (3d ed. 2002)).   The plaintiff, however, retains "the burden of demonstrating [that the defendants'] contacts with the forum state are sufficient to give the court in personam jurisdiction." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 699 (3d Cir. 1990).   "These contacts must be shown 'with reasonable particularity.'" *Wellness Publ'g v. Barefoot*, 128 Fed. App'x 266, 268 (3d Cir. 2005) (unpublished) (quoting *Mellon Bank v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992)).

"A federal court sitting in New Jersey has jurisdiction over parties to the extent provided under New Jersey state law." *Miller Yacht*, 384 F.3d at 96 (3d Cir. 2004).   "New Jersey's long-arm statute provides for jurisdiction coextensive with the due process requirements of the United States Constitution." *Id.*   (citing N.J. Ct. R. 4:4-4(c)).   A district court sitting in New Jersey may therefore exercise personal jurisdiction over a non-resident defendant if the defendant has "certain minimum contacts with [New Jersey] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Henry Heide, Inc. v. WRH Prods. Co.*,

*Inc.*, 766 F.2d 105, 108 (3d Cir. 1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Minimum contacts can be analyzed in the context of general jurisdiction or specific jurisdiction." *Metcalfe*, 566 F.3d at 334. "General jurisdiction results from, among other things, 'systematic and continuous' contact between a non-resident defendant and the forum state." *Spuglio v. Cabaret Lounge*, 344 F. App'x 724, 725 (3d Cir. 2009) (unpublished) (quoting *Int'l Shoe*, 326 U.S. at 320). "Specific jurisdiction over a defendant exists when that defendant has 'purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities.'" *Miller Yacht*, 384 F.3d at 96 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

Here, NICO has not argued that this Court has general jurisdiction over CSN. (See Pl.'s Opp. Br. at i). Accordingly, the Court only considers whether it has specific jurisdiction over CSN.

## III.    ANALYSIS

The parties dispute whether this Court has personal jurisdiction over CSN. To summarize, CSN contends that it does not have sufficient contacts with New Jersey to satisfy due process, and that even if it did have such contacts, the Court's exercise of jurisdiction over CSN would violate traditional notions of fair play and substantial justice. (CSN's Mov. Br. at i). NICO, for its part, argues that the Court has specific jurisdiction over CSN because CSN has purposefully directed its activities into New Jersey, and further because CSN's demand against NICO for the return of the premium is directly related to and arises out of CSN's activities with New Jersey. (Pl's. Opp. Br. at i). Alternatively, if the Court is not inclined to find that it has specific jurisdiction over CSN,

NICO asks the Court to permit jurisdictional discovery as to the nature and extent of CSN's contacts with Catalyst Re in this matter.  (Pl.'s Opp. Br. at 12).

## A.  Summary of Specific Jurisdiction Analysis

"Specific jurisdiction is established when a non-resident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from or is related to those activities." *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 150 (3d Cir. 2001) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  In other words, specific jurisdiction exists where the "cause of action arises out of the defendant's forum-related activities, such that the defendant should reasonably anticipate being haled into court in that forum." *Abel v. Kirbaran*, 267 F. App'x 106, 108 (3d Cir. 2008) (internal citations and quotations omitted).

Three elements must be met to establish specific jurisdiction. *HS Real Co., LLC et al. v. Sher*, 526 F. App'x 203, 206 (3d Cir. 2013).  First, the defendant "must have purposefully availed itself of the privilege of conducting activities within the forum." *Id.* (internal citations and quotations omitted).  Second, "plaintiffs' claims must arise out of or relate to at least one of the contacts with the forum." *Id.* (internal citations and quotations omitted).  Assuming the first two elements are met, the court moves on to the third element, which considers whether the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007).  The Court addresses each element, in turn.

## B.  CSN Purposefully Availed Itself of the Privilege of Conducting Activities within New Jersey

To satisfy the first element of personal jurisdiction, a plaintiff must provide evidence of "'some

act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 109 (1987) (quoting *Burger King*, 471 U.S. at 475). Stated differently, a plaintiff must show that the non-resident defendant "deliberate[ly] target[ed] . . . the forum." *Sandy Lane*, 496 F.3d at 317. "The purpose of the requirement of evidence of purposeful acts is to ensure that a defendant will not be subject to a forum's jurisdiction solely on the basis of random or attenuated contacts or of the unilateral activity of another person or entity." *Mastondrea v. Occidental Hotels Management, S.A.*, 391 N.J. Super. 261, 268 (App. Div. 2007) (citing *Burger King*, 471 U.S. at 475).

A defendant need not be physically present in a state to have availed himself of the privilege of conducting activities there. *See, e.g., Burger King*, 471 U.S. at 472. Indeed, Courts have found that a defendant purposefully availed itself of the forum state where the defendant reached into that state remotely, such as via telephone or e-mail communications. *See, e.g., Sandy Lane Hotel Co., Ltd.*, 496 F.3d at 318 (finding that a defendant "deliberately reached into" the forum state by mailing a brochure to the state's residents and exchanging phone calls to secure an agreement); *One World Botanicals v. Gulf Coast Nutritionals*, 987 F. Supp. 317, 323 (D.N.J. 1997) (finding sufficient minimum contacts with the forum state based upon defendant's one-time shipment of products into the forum in response to a fax order received from the forum); *Vanz, LLC v. Mattia & Associates*, No. 13-cv-1393, 2014 WL 1266220 at *2-3 (D.N.J. Mar. 26, 2014) (Wiggenton, J.) ("Various forms of communications between parties, including written correspondence, telephone calls, and emails, factor into the minimum contacts analysis.") (quotations omitted); *Am. Bd. of Int. Med. V. Rushford*, No. 14-cv-6428, 2015 WL 5164791 (D.N.J. Sept. 2, 2015) (Hayden, J.) (finding defendant purposefully availed itself of the forum state by sending e-mails and placing a

phone call into that state).

CSN maintains that it lacks any meaningful contacts with New Jersey under which jurisdiction could arise. CSN contends that its "communication with a broker in New Jersey—even the (inaccurate) allegation that the broker was CSN's agent—does not constitute jurisdictionally meaningful contacts with New Jersey, at least *vis-à-vis* NICO." (CSN's Mov. Br. at 2). More specifically, CSN contends that its contact (in the singular) with New Jersey consisted of "the mere act of wiring funds into New Jersey," which cannot support jurisdiction. (CSN's Mov. Br. at 11-12). According to CSN, its "contact with Catalyst does not reflect any attempt by CSN to participate in or engage with any market in New Jersey" and that, "[o]n the contrary, the purpose of CSN's contacts with Catalyst was to obtain access to the *international* market for retrocessional coverage *outside* of New Jersey." (Id. at 12). As such, CSN argues that its contact with a New Jersey broker was fortuitous, as the broker could have been located anywhere. (Id.).

In response, NICO argues that CSN's contacts with New Jersey are far more extensive than CSN's wiring of funds into an account located in New Jersey. To support this position, Plaintiff relies heavily upon a declaration of Alexandre Leventhal, the Managing Director of Catalyst Re. (See Pl.'s Opp. Br. at 12-23; McNally Decl., Ex. R, ECF No. 39-1, Declaration of Alexandre Leventhal, "Leventhal Decl."). Specifically, attached to Mr. Leventhal's declaration is an October 10, 2007 contract between CSN and Catalyst Re ("CSN-Catalyst Re Contract"). (Leventhal Decl., Ex. 1).

Pursuant to the terms of the CSN-Catalyst Re Contract, CSN paid Catalyst Re a flat fee for its brokerage services. (Leventhal Decl. ¶ 9). According to Mr. Leventhal, "[w]hen CSN and Catalyst Re entered [into this Contract], Catalyst Re began performing under that Contract almost immediately." (Id. ¶ 7). Moreover, "Catalyst Re's performance under the Contract on the 2007

11

Extension Period and 2008 Renewal Period included extensive dealings with CSN and multiple CSN communications, both oral and written, directed to and with Catalyst Re in New Jersey." (Id. ¶ 8). Finally, as conceded by CSN, CSN transmitted the premium payment for the 2008 Retrocessional Contract to a New Jersey bank account in Catalyst Re's name. (Id. ¶ 10).

### A. Summary of CSN's Direct Contacts with New Jersey

The Court finds that CSN has purposefully availed itself of the privilege of doing business in New Jersey through its direct contacts with its New Jersey reinsurance broker, Catalyst Re.

To begin with, it is evident that CSN purposefully directed its contacts into New Jersey when it entered into a three-year irrevocable contract with Catalyst Re, a New Jersey reinsurance broker, on October 10, 2007. (Leventhal Dec. ¶ 3; CSN-Catalyst Re Contract § 3). Per the terms of that Contract, Catalyst Re was to render "professional services of intermediary and consultancy for [CSN's] reinsurance area." (CSN-Catalyst Re Contract). Also pursuant to that Contract, CSN incurred certain obligations *vis-à-vis*, New Jersey—namely, it was required to "arrange with Sul America and IRB, the designation of Catalyst Re USA as the only reinsurance broker for the placement of coverage for excess of the domestic capacity with regard to the Operational Risk policy of CSN." (CSN-Catalyst Re Contract § 4.a.).

Aside from the existence of the CSN-Catalyst Re Contract, the record includes evidence of specific instances of CSN reaching out to Catalyst Re in New Jersey. For example, Mr. Leventhal's declaration explains that with regards to the 2007 Extension Period and the 2008 Renewal Period, CSN engaged in "extensive dealings with CSN and multiple CSN communications, both oral and written, directed to and with Catalyst Re in New Jersey." (Leventhal Decl. ¶ 8). Specifically, on April 2, 2008, CSN e-mailed Mr. Leventhal a letter

12

addressed to Mr. Jerome Halgan of the Berkshire Group (the parent corporation of NICO)[6] that advised Mr. Halgan that CSN will provide the premium payment necessary to effectuate the 2008 Retrocessional Contract. (McNally Decl. ¶ 4, Ex. B). Then, by letter dated April 20, 2008 and mailed to Mr. Leventhal in New Jersey, CSN notified Mr. Leventhal that it will be transferring funds to Catalyst Re, and expressly permitted Catalyst Re to transfer these funds to secure retrocessional coverage from "one or more of the international reinsurers." (McNally Decl. ¶ 5, Ex. C.). True to its word, CSN transferred nearly $20 million to a "premium account" registered to Catalyst Re in Ridgewood, New Jersey, approximately $9 million of which was then wired to NICO. (Compl. ¶ 31; McNally Decl. ¶ 7, Ex. E).

Courts in this district have found that a defendant purposefully availed itself of the benefit of doing business in New Jersey on significantly less contacts than those discussed above. *See, e.g., Am. Bd. of Int. Med. V. Rushford*, No. 14-cv-6428, 2015 WL 5164791 (D.N.J. Sept. 2, 2015) (Hayden, J.) (finding defendant purposefully availed itself of the forum state by sending e-mails and placing a phone call into that state); *see also One World Botanicals v. Gulf Coast Nutritionals*, 987 F. Supp. at 323 (finding sufficient minimum contacts with the forum state based upon defendant's one-time shipment of products into the forum in response to a fax order received from the forum).

At the outset, the Court rejects CSN's argument that the location of its New Jersey broker, and therefore CSN's contacts with New Jersey, were "fortuitous." (CSN's Mov. Br. at 12). Here, CSN has purposefully availed itself of the New Jersey market by entering into a multi-year contract for the provision of consulting services with a corporation "duly organized and validly existing under the law of New Jersey with its principal place of business" located in New Jersey. (Compl.

---

[6] Compl. ¶ 4.

¶ 2).  Thus, CSN benefitted from engaging in business with a New Jersey broker whose business activities are authorized by the State.  In addition to engaging a New Jersey-based broker, CSN directed both e-mail and mail communications to Catalyst Re in New Jersey, and also wired $20 million to a New Jersey bank account in order that Catalyst Re could transmit the money as CSN desired.  In light of these purposeful and not insignificant contacts with New Jersey, the Court finds that the first element of the specified jurisdiction analysis—whether the defendant has "minimum contacts" with the forum, is satisfied.

**B.  For Jurisdictional Purposes, the Court finds that Catalyst Re's Activities in New Jersey can be Imputed to CSN on an Agency Theory**

In addition to a defendant's direct contacts with the forum, "[a]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction."  *Grand Ent. v. Star Media Sales, Inc.*, 988 F.2d 476, 483 (3d Cir. 1993).  NICO contends that Catalyst Re acted as an agent of CSN with regards to certain events leading up to the alleged formation of the 2008 Retrocessional Contract, and that these actions can be imputed to CSN for the purposes of the Court's jurisdictional analysis.  (Pl.'s Opp. Br. at 15).  In response, CSN rejects the notion that Catalyst Re was its "agent," noting that it was IRB, rather than CSN, who had the requisite control over Catalyst Re as required under agency law.  (CSN's Mov. Br. at 11, n.6; CSN's Reply Br. at 9).

Under New Jersey law, "[a]n agency relationship arises when one party authorizes another to act on its behalf while retaining the right to control and direct any such acts."  *Rodriguez v. Hudson County Collision, Co.*, 296 N.J. Super. 213, 200 (1997); *see also Sylvan Learning Syst., Inc. v. Gordon*, 135 F. Supp. 2d 529 (D.N.J. 2000).  An agency relationship arises "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."  *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 337 (1993); *Edwin J. Dobson, Jr., Inc. v.*

14

*Rutgers, State University*, 157 N.J. Super. 357, 390 (Law Div. 1978) (holding a consultant that was paid by Rutgers was not an agent of Rutgers where the University "did not have the right to direct [ ] the consultant as to how to perform its work"). That said, in New Jersey, "[t]here need not be an agreement between parties specifying an agency relationship; rather, the law will look at their conduct and not to their intent or their words as between themselves but to their factual relation." *Rose*, 124 N.J. at 338. (internal quotations omitted). "Moreover, direct control over [an] agent is not absolutely necessary; a court must examine the totality of the circumstances to determine whether an agency relationship existed even though the principal did not have direct control over the agent." *Id.* (citing 2 C.J.S. Agency § 36, at 599-600 (1972)).

NICO argues that, in addition to CSN's direct contacts with New Jersey, "the actions of Catalyst Re in New Jersey, including communicating with NICO and CSN, preparing NICO's invoice regarding the premium for the Renewal Period, and wiring the premium to NICO from its New Jersey-based bank account, were all performed by Catalyst Re as an agent for CSN, and therefore provide additional grounds for this Court to exercise jurisdiction over CSN." (Pl.'s Opp. Br. at 15). NICO contends that an agency-principal relationship was plainly established by the CSN-Catalyst Re Contract. (Id. at 20). Specifically, NICO notes that the CSN-Catalyst Re Contract authorized Catalyst Re to advise CSN with regards to retrocessional coverage of the 2007 and 2008 CSN Policies, to provide services to CSN related to securing that coverage, and to maintain regular contact with CSN regarding that coverage. (Id. at 20). Plaintiff also directs the Court to CSN's communications to Mr. Leventhal, directing him to inform NICO that it will pay the premium under the 2008 Retrocessional Contract and further directing Mr. Leventhal to effectuate that payment by wiring to NICO the funds it had placed in Catalyst Re's New Jersey bank account. (Id.). According to the Complaint, Catalyst Re acted as an agent for CSN when it

asked NICO for an extension of time, at CSN's request, for which it could pay the premium for the 2008 Retrocessional Contract and when, also at CSN's request, it wired the funds to NICO. (Id. ¶¶ 26-28 70).

CSN contends that Catalyst Re was not its agent, but rather was "at most, a non-agent independent contractor of CSN." (CSN's Mov. Br. at 11, n.6).  In support of this position, CSN notes that Mr. Leventhal, by way of his declaration, did not claim to be CSN's agent.  (Id.). Further, CSN argues that the CSN-Catalyst Re contract states that Catalyst Re provided "consulting services" to CSN with respect to the reinsurance for CSN's insurance program, and that it was IRB, rather than CSN, that had the ability to control or direct the actions of Catalyst Re with respect to placing reinsurance.  (Id.).  CSN specifically directs the Court to a provision of the CSN-Catalyst Re Contract that reads, in part: "In compliance with the placement instructions issued by [IRB], Catalyst Re USA and/or Catalyst Re Brazil will maintain permanent contact with this entity, in order to update it on the progress of placement of the program." (CSN's Reply Br. at 9, citing CSN-Catalyst Re Contract § 4.d).

Drawing all reasonable inferences in favor of Plaintiff, *see Miller Yacht*, 384 F.3d at 97, the Court finds that, at least for jurisdictional purposes, Plaintiff has proffered sufficient evidence as to the existence of an agency relationship between Catalyst Re and CSN such that Catalyst Re's actions with regards to the 2008 Retrocessional Contract can be imputed to CSN as its "principal."

First, the Catalyst Re-CSN Contract provides that Catalyst Re would "submit for the approval of CSN, a chronogram of the project, whether it be with respect to the actions required for the extension of the expiring policy or with respect to renewals themselves." (CSN-Catalyst Re Contract § 6.1).  In other words, it is apparent that CSN had at least some degree of control over Catalyst Re's operations in regard to securing the 2008 Retrocessional Contract.  Further, the

16

Court rejects CSN's argument that an agency relationship could not have existed where it was IRB that ultimately directed Catalyst Re's actions, as New Jersey agency law does not require direct control over the agent in order to find an agency arrangement. *See Rose*, 124 N.J. at 338.

Second, Plaintiff has directed the Court to specific acts taken by Catalyst Re at the behest of CSN. For instance, after learning that IRB would not be able to fulfill its premium obligation under the 2008 Retrocessional Contract, "CSN, out of concern that such delay might negatively impact its recovery of losses under the 2008 CSN Policy, instructed Mr. Leventhal to communicate to NICO, on its behalf and as its agent, that CSN would guarantee payment of the premium owed by IRB to NICO under the 2008 Retrocessional Contract." (Compl. ¶ 26). Plaintiff also alleges that Mr. Leventhal, acting as CSN's agent, wrote to NICO informing it that CSN would pay the approximately $9 million premium and requesting an extension of time by which CSN could make the payment. (Id. ¶ 28). Additionally, after CSN wired $20 million to Catalyst Re's bank account, Catalyst Re transmitted approximately $9 million of the premium funds to NICO. (Id. ¶ 32).

In summary, the Court will consider the following actions of Catalyst Re as imputed to CSN for the remaining analysis: (1) Catalyst Re seeking retrocessional coverage of CSN's insurance policy (See Pl.'s Opp. Br. at 20; CSN-Catalyst Re Contract); (2) Catalyst Re writing to NICO to request an extension of the time period for which the premium may be due to secure that coverage (Compl. ¶ 28) and; (3) securing the alleged 2008 Retrocessional Contract by wiring to NICO the $9 million premium that CSN had transmitted to Catalyst Re's New Jersey bank account. (Compl. ¶¶ 31-32). [7]

---

[7] Notably, the Complaint does not allege that Catalyst Re acted as an agent for CSN in the actual negotiation of the 2008 Retrocessional Contract. (Compl. ¶¶ 57, 69). Rather, the Complaint alleges that Catalyst Re "acted as an agent for *IRB* in the negotiation, placement and issuance of the 2008 Retrocessional Contract," and that as an "agent for *IRB*, Catalyst Re took actions to put in place retrocessional coverage for the 2008-2009 year, including proactively seeking retrocessional coverage from NICO, negotiating the terms and conditions of the 2008 Retrocessional Contract, and otherwise making statements to NICO regarding the 2008 Retrocessional Contract on *IRB's* behalf." (Id. ¶ 69) (emphasis added). The Complaint does allege, however, that "Catalyst Re acted as an agent for CSN in connection

### ii.    Whether Plaintiff's claims "arise out of or relate to" CSN's contacts with New Jersey

Having found that Plaintiff has purposefully availed itself of the benefits of conducting business in New Jersey, the Court must now consider whether the claims at issue "arise out of or relate to" those contacts discussed above. *Sandy Lane,* 495 F.3d at 318 (citing *Helicopteros,* 466 U.S. at 414).

CSN asserts that NICO's claims against it cannot be said to "arise under or relate to" CSN's limited contacts with New Jersey. According to CSN, the "principle [sic] issue in dispute" is whether the alleged 2008 Retrocessional Contract between NICO and IRB was effective. (Id. at 10). CSN takes the position that these claims against it "have virtually nothing to do with the state of New Jersey and everything to do with the Republic of Brazil," as the Complaint alleges tortious activity that occurred in Brazil by a Brazilian company (CSN) and a Brazilian reinsurance company (IRB). (Id. at 9-10). Moreover, CSN states that the Complaint does not allege any tortious acts by CSN in New Jersey, any injury to NICO or any other party that was suffered in New Jersey, or any contacts between CSN and NICO that occurred in New Jersey. (Id. at 10). Rather, CSN posits that the dispositive issues of the existence of the 2008 Retrocessional Contract is contingent upon events occurring solely within Brazil, application of Brazilian law, and evidence arising out of prior legal proceedings between CSN and IRB in Brazil. (Id. at 11).

Plaintiff responds that its claims relate directly to CSN's contacts with New Jersey. (Pl.'s Opp. Br. at 23-26). Plaintiff has stated that "[t]he only reason that NICO initiated this action is

---

with the 2008 Retrocessional Contract" and that "[i]n its role as agent of CSN, Catalyst Re sought an extension (at CSN's request) of the time within which premium for the 2008 Retrocessional Contract could be paid, wiring funds (at CSN's request) to NICO in fulfillment of IRB's obligations." (Id. ¶ 70). Thus, the Court's finding that Catalyst Re acted as CSN's agent is limited to those specific allegations of agency alleged in the Complaint, as well as Plaintiff's argument offered in its opposition brief that the CSN-Catalyst Re Contract provided that Catalyst Re would act as CSN's agent by advising Plaintiff with regards to retrocessional coverage and by providing other services to CSN to ensure that the requirements of international reinsurers were met. (Pl.'s Opp. Br. at 20).

CSN's wrongful and improper demand for the premium amounts that it had arranged, through Catalyst Re, to be paid to NICO," and further, that "[b]ecause CSN's activities directed at and within New Jersey were centered entirely around ensuring that NICO and IRB's other retrocessionaires were paid the premium, it is beyond any reasonable dispute that NICO's claims arise out of and relate to CSN's activities in New Jersey." (Id. at 23). Stated differently, NICO posits that "CSN's contacts with New Jersey are relevant to the central issue of whether NICO is entitled to keep the premium advanced by CSN." (Id.).

The specific jurisdiction analysis is claim-specific. *Sandy Lane,* 496 F.3d at 318. Thus, a court must consider whether the defendant's contacts with the forum arise under or relate to each claim alleged by Plaintiff. *See Miller Yacht,* 384 F.3d at 104 ("In analyzing jurisdictional contacts on a claim-by-claim basis, we have been careful to note that forum contacts supporting a contract claim are not necessarily relevant to establishing jurisdiction over a tort claim."); *see also Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001) (separately analyzing specific jurisdiction over plaintiff's contract and tort claims).

Thus, in order to consider whether CSN's contacts with New Jersey are sufficiently related to Plaintiff's claims, the Court must first identify the precise nature of those claims. Plaintiff's claims appear to stem from two separate agreements, representing two distinct chains of events. First, Plaintiff's claims for declaratory relief (specifically, its request for a judgment as to the existence of the 2008 Retrocessional Contract and CSN's lack of rights with regards to the $9 million premium) relate to the existence of the 2008 Retrocessional Contract, and therefore sound in contract law. (Compl. ¶ 47). Second, Plaintiff's tort claims against CSN are grounded in the alleged wrongful Settlement Agreement entered into between IRB and CSN, under which the

parties disclaimed the existence of the 2008 Retrocessional Contract. (See Compl, Counts II, IV, V, VII).[8]

In *O'Connor v. Sandy Lane Hotel Co., Ltd.*, the Third Circuit provided guidance to district courts applying the relatedness requirement. 496 F.3d at 318. The Court noted that some Circuits applying this requirement have adopted a "but-for" test of causation, which asks whether the claims would have arisen in the absence of defendant's contacts with the forum. *Id.* at 319 (citing to First Circuit case law). Although the Circuit held that this test "is vastly overinclusive in its calculation of a defendant's reciprocal obligations" and therefore does not constitute the entirety of the relatedness analysis, it recognized that this analysis provides a helpful starting place. *Id.* (beginning the relatedness analysis with a determination as to whether defendant's contacts with the forum were a "but-for cause of [plaintiff's] injury"). To that end, this Court first considers whether CSN's contacts with New Jersey, discussed above, are a but-for cause of Plaintiff's claims.

Considering Plaintiff's allegations in the context of CSN's contacts with New Jersey, the Court finds that CSN's contacts are certainly a "but-for cause" of NICO's claims for both declaratory relief and claims in tort. If CSN had not directed communications into New Jersey in order to secure the assistance of a reinsurance intermediary, Catalyst Re would never have negotiated the 2008 Retrocessional Contract on IRB's behalf, and CSN would never have transmitted to NICO, via its New Jersey "agent," the $9 million premium to consummate that

---

[8] Count III of the Complaint does not appear to be directed towards CSN. (See Compl. at 10-12). Specifically, the "wherefore clause" states: "NICO demands judgement against IRB and Catalyst Re . . ." (Id. at 12). Accordingly, the Court did not address whether it has specific jurisdiction over CSN with regards to this Count. However, even if the Court construed the Complaint as alleging tortious interference with economic advantage against CSN, the Court would find that the this claim does not arise out of or relate to CSN's contacts with New Jersey for the same reasons discussed herein with regards to the tort claims specifically alleged against CSN.

Additionally, Count VI of the Complaint, alleging prima facia tort, was only asserted against IRB, who has been dismissed from this case. Therefore, the Court need not consider Count VI in this analysis.

Contract. Moreover, had that chain of events not taken place, IRB and CSN would not have entered into a Settlement Agreement which disclaimed the existence of the 2008 Retrocessional Contract and affirmed CSN's rights to recover the $9 million premium. Thus, CSN's contacts with New Jersey are certainly a but-for cause of NICO's alleged injuries.

Our inquiry does not stop here. Rather, the Court must now decide whether a "meaningful link exists between [CSN's] legal obligation[s] that arose in th[is] forum and the substance of [NICO's] claims." *Id.* at 324. Stated differently, the Third Circuit explained that the relatedness

> analysis should hew closely to the reciprocity principle upon which specific jurisdiction rests. . . With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations. Specific jurisdiction is the cost of enjoying the benefits. The relatedness requirement's function is to maintain balance in this reciprocal exchange. In order to do so, it must keep the jurisdictional exposure that results from a contact closely tailored to that contact's accompanying substantive obligations.

*Id.* at 323 (internal quotations and citations omitted).

### A. Plaintiff's Claims for Declaratory Relief relating to the Existence of the 2008 Retrocessional Contract and CSN's Rights to the $9 Million Premium are Sufficiently Related to CSN's Contacts with New Jersey

The Court finds that Plaintiff's claims for declaratory relief are sufficiently related to CSN's contacts with New Jersey such that CSN could have reasonably expected to be haled to Court in New Jersey based upon those activities. Specifically, NICO seeks a judgment from this Court:

> (1) Declaring that the 2008 Retrocessional Contract is a binding and enforceable agreement between IRB and NICO; (2) Declaring that CSN is not in privity with NICO under the 2008 Retrocessional Contract or any other agreement; (3) Declaring that CSN has no rights or interests in any of the premium paid to NICO under the 2008 Retrocessional Contract; [and] (4) Declaring that CSN has no right and is not otherwise entitled to payment from NICO of any amount relating to, arising out of, or in connection with the 2008 Retrocessional Contract.

(Compl. at 17).

Each of these declarations sought by Plaintiff relate to the existence and formation of the 2008 Retrocessional Contract.  As discussed above, CSN purposefully directed its activities into New Jersey when it entered into a three-year irrevocable contract with a New Jersey reinsurance broker precisely for the purpose of securing, among other coverage, the 2008 Retrocessional Contract now in dispute.  (See CSN-Catalyst Re Contract).  CSN also benefited from the New Jersey market by transmitting, via Catalyst Re, the premium necessary to effectuate the 2008 Retrocessional Contract from a New Jersey bank account to NICO.  (Compl. ¶¶ 30-32).  Thus, CSN cannot now argue that Plaintiff's claims for declaratory relief as to the existence of the 2008 Retrocessional Contract (a direct fruit of the CSN-Catalyst Re Contract) and CSN's rights to the $9 million premium transmitted to NICO do not sufficiently relate to its contacts in New Jersey.

The Court is cognizant of CSN's argument that its contacts in this regard are not sufficiently related to Plaintiff's claims because Plaintiff was not injured in New Jersey, Plaintiff is located outside of New Jersey, and because Plaintiff does not allege any wrongful acts that occurred in New Jersey.  (CSN's Reply Br. at 4).  However, CSN's arguments miss the mark.  As the Third Circuit has explained, "[t]he animating principle behind the relatedness requirement is the notion of a tacit quid pro quo that makes litigation in the forum reasonable foreseeable." *Sandy Lane*, 496 F.3d at 322.   Based upon CSN's actions in relation to securing the alleged 2008 Retrocessional Contract, the Court is not persuaded that CSN could not have foreseen being haled into Court on allegations as to the very existence of that Contract and CSN's rights to the money it transmitted through New Jersey.  Accordingly, the Court finds that a "meaningful link" exists between CSN's contacts with New Jersey and Plaintiff's claims for declaratory relief, rendering specific jurisdiction as to Count I proper.

**B.  Plaintiff's Tort Claims Relating to the Settlement Agreement are Not Sufficiently**

**Related to CSN's Contacts with New Jersey**

In addition to claims arising under the formation and existence of the 2008 Retrocessional Contract, Plaintiff brings tort claims against CSN.  Unlike the declaratory relief sought, which relates directly to CSN's involvement in the 2008 Retrocessional Contract, Plaintiff's claims for declaratory relief are premised upon the CSN-IRB Settlement Agreement that was entered into in Brazil.

Specifically, in Count II of the Complaint, Plaintiff alleges that "[b]y entering into the Settlement Agreement, CSN tortuously induced IRB to breach the 2008 Retrocessional Contract to the extent IRB purportedly conveyed upon CSN rights to the approximately $9 million in premium received by NICO for assuming substantial risk of loss under the 2008 Retrocessional Contract." (Compl. ¶ 52).  In Count IV, Plaintiff alleges that "[t]he retention of a benefit received by CSN in connection with the 2008 Retrocessional Contract, *in light of IRB's and CSN's denial* [via the Settlement Agreement] *that the 2008 Retrocessional Contract exists*, is unjust." (Id. ¶ 74) (emphasis added).   Similarly, Plaintiff's claims for injurious falsehood (Count V) and civil conspiracy (Count VII) are grounded in the alleged wrongfully executed Settlement Agreement (Id. ¶¶ 79, 96).

The Court finds that it lacks specific jurisdiction over CSN with regards to Plaintiff's tort claims arising from the Settlement Agreement.  Unlike NICO's claims for declaratory relief, which relate directly to CSN's very efforts to secure the 2008 Retrocessional Contract, these claims arise out of actions taken by CSN in Brazil.  To that end, the Court finds that it was not reasonably foreseeable that CSN would be haled to Court in New Jersey based upon its decision to execute a Settlement Agreement in Brazil in order to resolve an action that arose in Brazil and to which NICO, nor any New Jersey resident, appears to have been a party.  Accordingly, the Court declines

23

to exercise specific jurisdiction over CSN as to Counts II, IV, V, and VII of the Complaint.

### iii.   This Court's Exercise of Jurisdiction over CSN Comports with Traditional Notions of Fair Play and Substantial Justice

Having found that minimum contacts exist with regards to Count I of Plaintiff's Complaint, the Court "next consider[s] whether the exercise of jurisdiction would otherwise comport with 'traditional notions of fair play and substantial justice.'" *Sandy Lane*, 496 F.3d at 324 (quoting *Int'l Shoe*, 326 U.S. at 316).

CSN contends that this Court's exercise of jurisdiction over CSN would violate traditional notions of fair play and substantial justice in light of its position as a Brazilian company. (CSN's Mov. Br. at 14-19). Specifically, as a foreign defendant, CSN asserts that it would suffer a great burden in having to litigate thousands of miles from home in a foreign legal system. (Id. at 16-17). Moreover, CSN states that judicial efficiency and policy considerations, as well as New Jersey's alleged lack of any interest in this matter, militate toward a finding of no jurisdiction. (Id. 18). In support of this argument, CSN directs the Court to cases where courts have declined jurisdiction over a foreign defendant where the Plaintiff was not a resident of the forum. (Id. at 16). Lastly, CSN states that Brazil has an interest in litigating this action as it is "closely related to the dispute between CSN and IRB in Brazil [w]hich implicated important statutory and public policy issues in Brazil." (Id.).[9]

In response, NICO rejects CSN's argument that subjecting it to litigation in New Jersey would violate traditional notions of fair play and substantial justice. (Pl.'s Opp. Br. at 26-32).

---

[9] Notably, CSN has not represented to this Court that any action between NICO and CSN has in fact been initiated in Brazil. CSN has also argued that "a judgement in this matter will not afford NICO complete relief and will leave NICO susceptible to a contrary judgment in Brazil and other jurisdictions will recognize the Brazilian judgment" based upon the alleged failure of improper service. (CSN's Reply Br. at 11-12; CSN's Mov. Br. at 18-19). As the dispute over improper service will be dealt with after the Court's jurisdictional ruling, the Court will not consider this argument herein.

Plaintiff refutes CSN's argument that New Jersey lacks any interest in this matter and that CSN's contacts do not implicate the rights of New Jersey citizens, noting that New Jersey has an interest in protecting the business dealings of its corporate citizens such as Catalyst Re. (Id. at 29). NICO also contends that the State "has an interesting in protecting the rights of the investing public, including its residents, against companies like CSN that sell American Depository Receipts on the New York Stock Exchange and which may have made false and misleading statements in their SEC filings." (Id. at 30).

When a court has found that minimum contacts exist sufficient to assert jurisdiction over a defendant, the defendant "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477; *see also Grand. Ent.*, 988 F.2d at 483 ("The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy."). "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi*, 480 U.S. at 114.

Plaintiff has not met this heavy burden. "[T]he determination of reasonableness of the exercise of jurisdiction in each case will depend on an evaluation of several factors." *Asahi*, 480 U.S. at 113. Specifically, courts consider: "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Id.* Additional considerations include "the procedural and substantive interests of other nations" *id.* at 113 and "the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies." *Sandy Lane*, 496 F.3d at 324 (quoting *Burger King*, 471 U.S. at 477).

The Court notes that some of these factors weigh in favor of relinquishing jurisdiction over the Brazilian defendant. First, the Court agrees with CSN that it will be burdensome for the

Brazilian corporation to litigate in New Jersey in a foreign legal system. However, the Court notes that because of the international nature of this dispute, NICO would undoubtedly face the same burdens were it to litigate in Brazil. *See Sandy Lane*, 496 F.3d at 325 ("[R]equiring the [plaintiffs] to litigate in Barbados would saddle them with a burden at least equal to [defendant's] burden in Pennsylvania."). Additionally, that Plaintiff is not a New Jersey resident tends to militate in favor of relinquishing jurisdiction. Yet, the Court disagrees with Plaintiff that New Jersey lacks any interest in the instant litigation because NICO "is not located in the forum state and no rights of forum citizens are implicated by claims against CSN." (CSN's Mov. Br. at 17). The instant action implicates a New Jersey resident, Catalyst Re, with whom CSN purposefully entered into a long-term business relationship. Thus, regardless of whether Catalyst Re asserts any claims against CSN,[10] New Jersey certainly has an interest in the instant action.

Moreover, the fact that New Jersey "may not be the best forum" or even a "convenient one" does not require this Court to relinquish jurisdiction over a foreign defendant. *Sandy Lane*, 496 F.3d at 325. In light of CSN's purposeful and significant contacts into New Jersey, the Court finds this forum to be a reasonable one, and due process requires no more than that. *Id.*

## IV.    The Court Declines to Grant Jurisdictional Discovery

In its opposition brief, NICO has asked the Court to permit jurisdictional discovery if the Court finds specific jurisdiction lacking. (Pl.'s Opp. Br. at 33).

The Third Circuit has stated that unless a plaintiff's claim of personal jurisdiction is "clearly frivolous," courts "are to assist the plaintiff by allowing jurisdictional discovery prior to granting a motion to dismiss on lack of personal jurisdiction grounds. *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003). "If a plaintiff presents factual allegations that suggest

---

[10] Pursuant to this Court's June 10, 2015 Order, Catalyst Re was not required to file an answer or otherwise respond to the Complaint until after the Court's disposition of the parties' personal jurisdiction dispute. (See ECF No. 55).

26

'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state," the plaintiff's right to jurisdictional discovery should be sustained. *Id.*

Here, Plaintiff has asked for jurisdictional discovery only as to "nature and extent of CSN's contacts with Catalyst Re in this matter." (Pl.'s Opp. Br. at 33). As discussed in detail above, the extent of the CSN-Catalyst Re relationship bears upon this Court's jurisdiction over NICO's claims for declaratory relief (premised upon the existence of the 2008 Retrocessional Contract), over which this Court has already determined that it has specific jurisdiction. The Court finds that jurisdictional discovery as to the relationship between CSN and Catalyst Re would have no bearing on this Court's specific jurisdiction analysis with regards to NICO's tort claims arising out of the Settlement Agreement that was executed in Brazil. Therefore, the Court declines to grant jurisdictional discovery.

## V.    CONCLUSION

For the reasons stated herein, the Court grants in part and denies in part CSN's motion to dismiss for lack of personal jurisdiction. An appropriate Order accompanies this Opinion.

IT IS SO ORDERED.

DATED:   February ___8___, 2016

                                        _____
                                        JOSE L. LINARES
                                        UNITED STATES DISTRICT JUDGE